[Sac. No. 1450. In Bank.—May 13, 1907.]

A. DE LONG, Respondent, v. MILLER & LUX (a Corporation), Appellant.

NEGLIGENCE — PUBLIC HIGHWAY — DRIVING INTO HOLE COVERED WITH WATER—EVIDENCE.—In an action to recover damages for personal injuries occasioned to the plaintiff while traveling along a public road, by reason of his driving into a hole which was concealed by water alleged to have been caused to flow there through the negligence of the defendants in maintaining a certain dam on its lands, it is *held*, upon a review of the evidence, that there is no evidence to show that any water which may have been upon the highway at the place where the plaintiff claimed to have been injured was caused to flow there by reason of such dam.

APPEAL from an order of the Superior Court of Merced county refusing a new trial. E. N. Rector, Judge.

The facts are stated in the opinion of the court.

Frohman & Jacobs, Frank H. Short, and J. K. Law, for Appellant.

F. G. Ostrander, and F. W. Henderson, for Respondent.

SLOSS, J.—This is an action brought to recover damages for personal injuries alleged to have been sustained by the plaintiff through the negligence of the defendant. The complaint alleged that on or about the twenty-seventh day of June, 1900, plaintiff was riding in a buggy along a certain public highway in Merced County known as the "Wilson Ranch Road"; that the defendant wrongfully and negligently caused water to flow over, along and across said highway by means of a dam constructed and maintained by the defendant across a slough at a point about one-half mile from the highway, whereby the waters of the slough were turned out and spread over the adjoining land and caused to run over and across the highway; that this water formed a deep hole in the highway which was covered by said water so it could not be seen; that while the plaintiff was riding along this highway the front wheels of his buggy ran into said hole and plaintiff was violently thrown from the buggy, striking

against one of the wheels of said buggy, whereby he sustained great bodily injury, to wit: a double inguinal hernia; that plaintiff fell into the water and was chilled, thereby contracting rheumatism. The plaintiff sought to recover damages in the sum of twenty-five thousand dollars.

The answer denied that any water was caused to flow along or across the highway by reason of the dam referred to in the complaint, but, on the contrary, averred that the water on the highway was the natural overflow water from the San Joaquin River and the sloughs running from said river. It denied plaintiff's alleged injuries, and set up an affirmative plea of contributory negligence.

At the trial the jury returned a verdict in favor of plaintiff in the sum of ten thousand dollars. A motion for new trial was made by defendant, and upon said motion being argued and submitted to the court, it was ordered that the motion be granted unless plaintiff should agree to a reduction of three thousand dollars from the amount of ten thousand dollars found by the verdict of the jury. This reduction was agreed to by the plaintiff and the court denied the motion for new trial. From the order denying the motion for new trial this appeal is taken.

The principal point made by the appellant, and the only one which need be considered here, is that there was no evidence to show that any water which may have been upon the highway at the place where plaintiff claimed to have been thrown from his buggy was caused to flow there by reason of the dam mentioned in the complaint.

The road in question is the county road running from Merced to Los Banos in the county of Merced, and plaintiff was on his way from Merced to Los Banos when the accident is alleged to have occurred. From the maps showing the surrounding territory and the testimony concerning the topographical conditions, it appears that the road traverses a stretch of low lands running southerly and westerly from the left bank of the San Joaquin River. The river runs at this part of its course in a northerly and westerly direction through flat and low-lying lands on either side. The road from Merced crosses the river by means of a bridge at a point known as Dickenson's Ferry, and runs thence southerly across these low-lying lands to a bridge over a slough desig-

nated in the evidence as Middle Slough, thence continuing
in the same direction for some distance across other low lands
to another bridge across Salt Slough. Middle Slough runs
out of the San Joaquin River in a westerly direction several
miles above Dickenson's Ferry. Some distance to the west
of the point where it is crossed by the road, Middle Slough
connects with Salt Slough, a slough emerging from the San
Joaquin River at a point higher up than Middle Slough. Salt
Slough, after its junction with Middle Slough, runs in a
northerly and westerly direction until it again rejoins the
San Joaquin River. The land inclosed by the San Joaquin
River and Salt Slough forms an island known as San Luis
Island, all of which is composed of flat and bottom land
intersected by numerous sloughs and swales. These low
lands have always been flooded for a considerable portion of
each year by water overflowing the banks of the San Joa-
quin River. A large part of this territory, including the
portion of the island inclosed between the road in question,
the San Joaquin River, and Middle Slough, is owned by the
defendant, which has been conducting farming operations
upon it and has erected certain dams and levees for the pur-
pose of irrigating the land and controlling the flow of the
flood waters from the river. It appears that the defendant
had constructed a dam across Middle Slough at a point about
one-half mile up-stream from the road, and the contention of
the plaintiff at the trial was that this dam had caused water,
which would have remained within the banks of the slough
or returned to it, to be diverted to the north and west,
and thence to run across the road, causing and covering up
the hole into which the plaintiff's buggy fell.

The principal witness upon whom plaintiff relied in at-
tempting to establish his theory of the case was one H. H.
Henderson, a surveyor. The map introduced by plaintiff
was prepared by Henderson, and he testified at length con-
cerning it and regarding the conditions existing in the terri-
tory in question. From Henderson's testimony it appeared
that the road in question was elevated above the surface of
the adjoining ground for a considerable distance after it left
Dickenson's Ferry. After it reached the end of this ele-
vated portion (or "grade," as it is called in the testimony),
the road ran over the natural surface of the ground for a

distance, and then came to a second and shorter piece of grade, after which it continued over the natural surface of the ground (except at a point where there was a culvert) until it reached the bridge over Middle Slough.

According to Henderson's testimony, the first continuous grade was 8,653 feet in length. There was then a stretch of 447 feet ungraded; then a second grade of 324 feet, from the end of which the road ran 1,626 feet to a culvert over a low place, and thence 3,746 feet to the bridge across Middle Slough. A point near the end of the second grade of 324 feet is marked "B" on Henderson's map, and Henderson's testimony was to the effect that there was, in June, 1900, a hole in the road at this point, and that this hole was covered to a greater or less extent by water which had been diverted thither by reason of the dam in Middle Slough referred to in the complaint. While the defendant insists that the evidence, taken as a whole, is insufficient to justify the inference that any water was diverted by the dam so as to cross the road at point "B," it may be assumed, for the purposes of this discussion, that Henderson's testimony tended to establish this fact. If there were evidence on the part of plaintiff to show that the injuries sustained by him occurred by reason of his buggy falling into a hole at this point, it might well be said that there was enough to justify the jury in finding that the injury complained of was caused by the act of the defendant in maintaining its dam across Middle Slough.

But a careful examination of the testimony demonstrates that the hole into which plaintiff claims to have fallen was not situated at point "B" on the map, but, on the contrary, was located at least 1,000 feet to the north of this point. There were no witnesses to the accident except the plaintiff and his son, who were riding together in the buggy. The son was driving. According to the son's testimony, they started in the buggy down the grade from Dickenson's Ferry, and had driven for some distance when they struck water. While they were passing through this water they got into the hole and the plaintiff was thrown out. The hole was about at the end of the first grade. The water began at a point where the first of a series of stakes was set. (The uncontradicted evidence of the man who set the stakes

shows that the first of them was set at or near the end of
the first long grade.)    The plaintiff himself testified that
about a mile and a quarter beyond the bridge ''it looked
as though water had passed over the road there, and pretty
soon we could .see the stakes on each side of the road, and
as we got down a little further the water was deeper. . . .
We were driving along the grade when we first struck the
water.    After we struck the water we went along, and all of a
sudden our left front wheel dropped right down into a hole
up to the axle.''    He testified further that they had traveled
about eight or ten rods between the stakes before they struck
the hole.·    This testimony shows conclusively that the hole
into which the buggy fell could not have been the hole found
by Henderson at point ''B'' at the end of the second grade.
If we assume that Henderson's map accurately defined the
length of the first grade, the point where the accident occurred
was some hundreds of feet north of point ''B.''    The sec-
ond grade itself was 324 feet in length, and between the
first grade and the second there was a distance of 447 feet,
little, if any, of which had, according to the testimony of
the De Longs, been traversed.    But, in addition to this, it
appears conclusively from the transcript that Henderson was
in error in fixing the end of the first grade at the point
where it is shown on the map, and that in 1900, at the time
of the accident, that grade in fact ended at ·a point some
600 feet north of the point shown by Henderson as the end
of that grade.    It appears that, while the accident occurred
in 1900, the action was not commenced until 1902, and the
trial took place in 1904.    Henderson made his survey and
map in the latter year, and represented the road as it then
appeared.    It is true that he testified that he had been over
the road repeatedly in 1900, in fact that he had been over it
within a day of the accident to De Long, and that the grade
as indicated on his map was in the same condition it had been
in 1900.    But he was not clear and certain in his statement
that the first grade had not been lengthened since 1900, and,
in view of all the testimony, it is perfectly evident that his
memory was·at fault in this respect.    The defendant called
eight witnesses, all of whom testified that the southerly 600
feet of the first grade had been added in the year 1901, and
had not existed in 1900.    These witnesses included a super-

visor of Merced County, who had been in charge of that portion of the road in 1900 and 1901, and had had the last 600 feet graded in the fall of 1901, the roadmaster who had actually extended the grade, and other officials and residents in the neighborhood, who were thoroughly familiar with the circumstances testified to. In view of the fact that Henderson's map was prepared from surveys made four years after the occurrence of the accident, and that his statement that the grade was in the same condition in 1900 that it was at the time of his survey was based merely upon a recollection not positively asserted, there cannot be said to be a substantial conflict on this point, and it must be taken as an established fact that the first grade in 1900 ended at a point 600 feet north of the end of the grade as shown on Henderson's map. If this be so, the accident to the plaintiff must have occurred at a point at least 1,000 feet north of point "B," the point at which Henderson found a hole, and the point where, as shown by his testimony, the water diverted by the dam across Middle Slough would cross the road.

We do not find in the record any evidence tending to show that the water which crossed the road at the point where, according to the testimony of plaintiff and his son, the accident occurred, was caused to be there by reason of the dam mentioned in the complaint. The testimony of the witnesses who established the fact that the last 600 feet of the first grade were added in 1901, shows that this portion of the grade was constructed across a particularly low piece of ground, which was always flooded whenever there was any water in the surrounding country. Henderson's testimony fails to show that water diverted by the dam reached the point at or near the end of the first grade where the accident occurred, and his statement as to the elevations of the ground at various points affords no ground for the inference that such water did reach this point. The only evidence pointed to as sustaining the contention is that of the witness Tucker. He testified that he had seen the water flowing across the grade as the result of the diversion from Middle Slough at the dam, that he had seen it "run up on the grade about a mile and a half, different places ran over the grade." But he subsequently modified this statement by stating, "Just a short piece of the grade will overflow from that water, about

sixty feet," and later, on cross-examination, stated that "It was running 60 feet over the grade on the short piece there," evidently referring to the second grade ending at point "B." At a later point he stated that he "had found some water on the main grade, running over the main grade about eight or ten feet wide." But as this was stated to be about half a mile from the south end of the main grade, it is apparent it could have had no connection with plaintiff's injuries, even if we are to attach any importance to testimony so vague and uncertain as that given by this witness. Plaintiff's case seems to have been tried upon the theory that the accident occurred at point "B," and his main effort was to show that any overflow of the road which existed at that point was caused by the erection of the defendant's dam across Middle Slough. Assuming that this effort was successful, it appeared that the injury to plaintiff occurred at an entirely different point, and as the plaintiff failed to show that any act of the defendant caused the condition of the road at this point, the evidence must be held to be insufficient to justify the verdict.

Many other points are made by the appellant, but in view of the conclusion reached regarding the evidence, it will be unnecessary to consider any of them.

The order denying a new trial is reversed.

Shaw, J., Henshaw, J., McFarland, J., Angellotti, J., and Lorigan, J., concurred.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing, and filed the following opinion on June 15, 1907:—

BEATTY, C. J.—I dissent from the order denying a rehearing and from the judgment of the court. A careful examination of the evidence convinces me that the testimony of the plaintiff and his son does not necessarily lead to the conclusion that the accident occurred at or in the immediate vicinity of the end of the grade as it existed in 1900, or, in other words, at a point one thousand feet, or thereabouts, north of point B. They were testifying from recollection and

did not pretend to locate with precision the position of the hole into which they drove, and while plaintiff places it eight or ten rods from the end of the first grade at one time, he puts it at twenty rods in another part of his evidence, and describes it as one third of the way "across the water." "Across the water" in that connection meant the overflowed space between the end of the long grade and the beginning of the short grade, which, at the time of the accident was 1,047 feet wide, so that according to this testimony the hole was located over 300 feet from the end of the first grade, and the most trustworthy evidence in the case—the levels established by actual survey—shows that water diverted by the dam of defendant not only might have reached that point, but in seeking its own level must inevitably have overflowed all the low graded part of the road up to the terminus of the long grade as then existing.